**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

-------------------------------------------------------------------X

DAZINIA GRAHAM,

                    Plaintiff,

       -against-

AHS HOSPITAL CORP. d/b/a MORRISTOWN
MEDICAL CENTER and SHELLE POWELL,


                    Defendants.

-------------------------------------------------------------------X

Civil Action No.:


**COMPLAINT**


**Jury Trial Demanded**

       Plaintiff Dazinia Graham ("Graham" or "Plaintiff") alleges against AHS Hospital Corp. d/b/a Morristown Medical Center ("AHS") and Shelle Powell ("Powell") (collectively, "Defendants"), upon information and belief, as follows:

**<u>NATURE OF THE CLAIMS</u>**

1.     Graham complains pursuant to American with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADAAA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by, *inter alia*, the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("Title VII"), the Pregnant Workers Fairness Act, 42 U.S.C. §§ 2000gg *et seq.* ("PWFA"), and the New Jersey Law Against Discrimination, N.J.S.A §§ 10:5-1 *et seq.* ("LAD"), seeking damages to redress the lost wages, emotional distress, and other harms she suffered and continues to suffer as a result of being discriminated against and denied a reasonable accommodation by her former employer on the basis of her **<u>disability and pregnancy</u>** and retaliated against by her former employer after opposing and complaining of discrimination.

2.      The Federal and New Jersey state anti-discrimination and anti-retaliation laws are intended to afford all employees the same rights, regardless of their pregnancy or disability status, and provide them with the dignity and respect they deserve in the workplace.  As such, this is an action for declaratory and monetary relief to redress Defendants' unlawful employment practices, including the unlawful discrimination and retaliation committed against Plaintiff

## JURISDICTION AND VENUE

3.      This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).  This Court has supplemental jurisdiction over Plaintiff's claims under city and state law pursuant to 28 U.S.C. § 1367(a), in that the state and federal claims arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

5.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## EXHAUSTION OF REMEDIES

6.      On or about April 1, 2024, Plaintiff duly filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge Number 524-2024-01181.

7.     On or about January 17, 2025, the EEOC terminated its processing of the Charge of Discrimination—making no determination on the merits of the Charge—and issued Plaintiff a Notice of Right to Sue.

8.     Plaintiff has exhausted her administrative remedies and files this Complaint within 90 days of the EEOC's issuance of her Notice of Right to Sue, satisfying all procedural prerequisites for bringing this action.

## PARTIES

**Plaintiff Dazinia Graham**

9.     At all times relevant to this action, Graham was and is a resident of Essex County, New Jersey.

10.     Graham was and is a woman.

11.     From approximately November 9, 2020, until on or around March 15, 2024, Graham was employed by AHS as a Sterile Processing Technician.

12.     For the duration of her employment with AHS, Graham reported to work at Morristown Medical Center—a medical facility operated by AHS—located at 100 Madison Avenue, Morristown, New Jersey 07960 (the "Facility").

13.     From approximately October 2021 through the end of Graham's employment with AHS, Graham worked under the supervision of, and was in a subordinate position to, Powell.

14.     For the duration of her employment with AHS, Graham was an employee of AHS within the meaning of all applicable statutes.

**Defendant Atlantic Hospital Corp. d/b/a Morristown Medical Center**

15.     At all times relevant to this action, AHS was and is a domestic non-profit corporation duly organized and existing under and by virtue of the laws of the State of New Jersey.

16. At all times relevant to this action, AHS was and is a domestic non-profit entity authorized to operate in the State of New Jersey.

17. At all times relevant to this action, AHS maintains its corporate headquarters at 475 South Street, Morristown, New Jersey 07960.

18. At all times relevant to this action, AHS owns, manages and/or operates Morristown Medical Center.

19. At all times relevant to this action, Morristown Medical Center is a private medical facility within the Atlantic Health System network that provides hospital and other healthcare services to the public.

20. At all times relevant to this action, Morristown Medical Center is located at 100 Madison Avenue, Morristown, New Jersey 07960.

21. For the duration of Graham's employment with AHS, AHS employed fifteen (15) or more employees.

22. At all times relevant to this action, AHS was a covered entity within the meaning of all applicable statutes

23. At all times relevant to this action, AHS was an employer of Graham within the meaning of all applicable statutes.

**Defendant Shelle Powell**

24. Upon information and belief, at all times relevant to this action, Powell was and is a resident of New Jersey.

25. At all times relevant to this action, Powell was employed by AHS as the Manager of the Sterile Processing Department at the Facility.

26. From approximately October 2021 through the end of Graham's employment with

AHS, Powell was in a position superior to Graham with respect to their employment at AHS.

27. From approximately October 2021 through the end of Graham's employment with AHS, Powell possessed and exercised supervisory authority over Graham.

28. In her capacity as Manager of the Sterile Processing Department at the Facility for AHS, Powell possessed and exercised authority, vested in her by AHS, over the terms and conditions of Graham's employment with AHS, including, but not limited to the authority to hire and fire, monitor and evaluate performance, impose discipline, set and/or modify work schedules, assign work duties and responsibilities, review and approve or deny requests for accommodation, engage in the collaborative process, set, modify, and/or enforce AHS's policies on discrimination, requests for reasonable accommodations, and retaliation, determine and modify Graham's employment status (i.e., part-time or full time) with AHS, and otherwise control the terms and conditions of Graham's employment with AHS.

29. From approximately October 2021 through the end of Graham's employment with AHS, Powell was an employee of AHS within the meaning of all applicable statutes.

**FACTS**

30. On or around November 9, 2020, Graham commenced employment with AHS as a "per diem" Sterile Processing Technician at the Facility.

31. Although Graham was classified as "per diem", from her hire at AHS until approximately August 26, 2023 (other than when she was injured), she worked a regular schedule of ten (10) workdays in a fourteen (14) day period, with each workday consisting of at least one eight-hour shift.

32.    In addition to her regular schedule, on an almost weekly basis until approximately August 26, 2023 (other than when she was injured), Graham routinely applied for additional shifts, which required approval by Powell.

33.    Prior to August 26, 2023, Graham's request for additional shifts was denied only once.

34.    As a result, prior to August 26, 2023 (other than when she was injured), in addition to her regularly scheduled shifts, Graham worked a double shift approximately two or three times per week.

35.    In addition to other benefits, Defendants paid Graham an hourly rate of pay, with shift differential enhancements and, when exceeding 40 hours per week—which she regularly did—the overtime premium.

36.    At all times relevant to this action, Graham was qualified for the position of Sterile Processing Technician.

37.    For the duration of her employment with AHS, Graham was assigned to the Facility, where she reported to work.

38.    As a Sterile Processing Technician for AHS, Graham was assigned to work in the Facility's Sterile Processing Department, which was responsible for the preparation of surgical trays, instruments, and other equipment in advance of surgeries conducted throughout the Facility, the distribution of the prepared supplies to surgery sites, and the decontamination of surgical trays and equipment following surgery.

39.    In the Sterile Processing Department, employees—including Graham—were assigned to work at designated stations, on a rotating basis.

40.     Within her assigned roles, Graham's duties and responsibilities included, but were not limited to sterilization of surgical instruments, assembling surgical trays for distribution, arranging for the distribution of surgical trays to the appropriate floor, manual cleaning and decontamination of surgical instruments, and breaking down surgical trays following their use.

41.     For the duration of her employment with AHS, Graham satisfactorily performed her duties and responsibilities.

42.     At or around the end of May 2023, Graham learned she was pregnant.

43.     From at least the end of May 2023 through the end of Graham's employment with AHS, Maple Campbell ("Campbell") was Graham's direct Supervisor and Powell's direct report.

44.     From at least the end of May 2023 through the end of Graham's employment with AHS, when Campbell was on vacation, Rosina Bekoe ("Bekoe") was the Acting Supervisor and assumed Campbell's supervisory responsibilities and authority, including serving as Graham's direct Supervisor and Powell's direct report.

45.     On or around June 1, 2023, Graham told Campbell and Bekoe that she was pregnant.

46.     On or around June 5, 2023, while working at the Facility, Graham injured her back.

47.     In connection with her back injury, Graham was out on worker's compensation for two weeks, until she could be examined by AHS's doctors.

48.     Following the two-week period during which she was recovering from her back injury from home, Graham returned to work.

49.     AHS's Occupational Medical Service ("OMS") determined that, as a result of her back injury, following her return to work, Graham required a "light duty" position.

7

50. Upon Graham's return to work, OMS assigned Graham to work exclusively at the 'Front Desk' station at the Patient Information Department within the Facility.

51. The 'Front Desk' station is a receptionist position, primarily entailing answering the telephone, checking in visitors, and performing clerical work.

52. Defendants' assignment of Graham to the 'Front Desk' station upon her return to work was an accommodation for her back injury.

53. As an accommodation for her back injury, Defendants assigned Graham exclusively to the 'Front Desk' for approximately two months following her return to work—until approximately August 20, 2023.

54. Throughout Graham's assignment to the 'Front Desk' station, Graham was required to—and did—regularly communicate with Powell, providing her with updates.

55. The role of the 'Front Desk' station was within Graham's duties and responsibilities as a Sterilization Processing Technician for AHS.

56. For the duration of Graham's assignment to the 'Front Desk' station as an accommodation for her back injury, Graham was able to—and did—satisfactorily perform the duties and responsibilities of that position.

57. Graham's two-month exclusive assignment to the 'Front Desk' station as an accommodation for her back injury did not impose an undue hardship on AHS's business operations.

58. On or about August 26, 2023, Graham—then approximately four months pregnant—suffered vaginal bleeding due to a complication from her pregnancy.

8

59. In light of the potential immediate risk to her health and the continued viability of her pregnancy, Graham' vaginal bleeding was an urgent condition requiring her to seek emergency medical care.

60. Upon initial examination, the medical professionals examining Graham were unable to ascertain if she suffered a miscarriage and were unable to locate the source of the bleeding.

61. As a result, Graham's doctors directed her to stay home from work for two weeks.

62. Graham later learned that the source of her vaginal bleeding was due to a low-lying placenta, which posed a risk to the health and safety of both Graham and the fetus.

63. On or about August 29, 2023, Graham notified OMS that she was suffering from vaginal bleeding related to her pregnancy and informed Powell that she was having serious pregnancy-related health issues.

64. In those communications, Graham told both OMS and Powell that she could not return to work until she received approval from her doctor.

65. On or about September 6, 2023, Graham received a note from her doctor (the "September 6 Note").

66. The September 6 Note indicated that Graham was receiving medical care related to her pregnancy and cleared Graham to return to work the next day—September 7, 2023—with only the following restrictions:

    a. Frequent bathroom breaks;

    b. Ability to keep food or drink at workstation, **if needed** (emphasis added); and

    c. No heavy lifting greater than 15 pounds and no prolonged standing

67. Graham uploaded the September 6 Note to the AHS portal on September 6, 2023—the day she received it—in accordance with AHS's procedure for providing accommodation requests and other medical documentation.

68. Between September 6, 2023, and September 11, 2023, Graham made multiple attempts to communicate with Powell, including by calling her and through email.

69. Between September 6, 2023, and September 11, 2023, Graham notified Powell that she was cleared to return to work with a accommodations for her pregnancy.

70. Without allowing Graham to articulate her restrictions or the accommodations she was requesting, Powell informed Graham that she could not be accommodated.

71. Powell refused to engage in any dialogue with Graham as to the nature of her restrictions, her requested accommodations, or any alternative methods of accommodating Graham's restrictions that would allow her to perform her job.

72. Powell entirely failed to engage in the interactive process.

73. Had she done so, Powell would have learned that Graham did not need to keep food or drink at her workstation. Additionally, had she engaged Graham in the interactive process, Powell would have learned that Graham was able to perform the duties and responsibilities of most stations in the department, so long as she was able to take occasional bathroom breaks and brief seating breaks.

74. Of the stations to which Graham could have been assigned within the restrictions of the September 6 Note, the duties and responsibilities of each station could have been performed satisfactorily with occasional bathroom breaks.

75. Of the stations to which Graham could have been assigned within the restrictions of the September 6 Note, each station was either a seated position, the duties and responsibilities

could have been satisfactorily performed from a stool or a chair, or the duties and responsibilities could have been performed satisfactorily with brief seating breaks.

76.     Immediately after Powell's outright refusal to consider any accommodations for Ms. Graham, Graham spoke with Linda Fullam ("Fullam"), Workforce Experience Specialist, a member of AHS's Human Resources ("HR") department.

77.     Graham told Fullam that she was having pregnancy-related complications and that she was cleared to return to work with accommodations, but that Powell refused to allow her to return to work and would not even discuss the accommodations she was seeking.

78.     Graham asked Fullam if Powell was permitted to reject Graham's request to return to work without even discussing her accommodations.

79.     Fullam told Graham that Powell could reject her request to return to work without discussing her accommodations, and that the decision to allow Graham to return to work, "was up to [Graham's] department"—meaning Powell.

80.     On September 11, 2023, Graham contacted Melissa Smith ("Smith"), HR Case Absence Leave Manager, explaining that Powell rejected her request to return to work and asked her what to do.

81.     Smith told Graham that she needed to be approved by OMS first to return to work.

82.     Graham responded that OMS refused to allow her to return to work without Powell's approval, and Powell refused to approve Graham's return to work because of her need for accommodations.

83.     The cycle of HR requiring OMS approval for Graham to return to work, OMS requiring Powell's approval to grant their approval for Ms. Graham to return to work, and Powell refusing to consider **any** accommodation that would allow Graham to return to work, continued.

11

84.     On September 14, 2023, Graham uploaded an updated doctor's note—received the same date—to the AHS portal (the "September 14 Note").

85.     The September 14 Note requested seven "adjustments to [Graham's] job responsibilities and working conditions".

86.     However, three of the requested "adjustments" in the September 14 Note entailed ensuring Defendants generally maintained a safe and supportive workplace and, where necessary, provided training.

87.     These three requested adjustments imposed no further requirements on Defendants beyond their existing legal obligations and, upon information and belief, were already mandated by AHS's existing internal policies.

88.     The remaining four restrictions listed in the September 14 Note—those that imposed additional requirements Defendants—were:

    a.     Providing Graham days off to see her healthcare provider;

    b.     Limiting Graham's exposure to hazardous chemicals (providing PPE when necessary);

    c.     Modifying some physical tasks as necessary (i.e., modifying or temporarily reassigning heavy lifting—noted as 35 pounds or greater—or repetitive strenuous motions);

    d.     Providing regular breaks and workload management

89.     The September 14 Note imposed these restrictions "during the course of [Graham's] pregnancy".

90.     The September 6 Note stated Graham's estimated due date was January 18, 2024.

91.    With the restrictions set forth in both the September 6 Note and September 14 Note,, Graham was able to satisfactorily perform the duties and responsibilities of a multitude of stations within the department, with either no modification or minimal, non-burdensome accommodations (such as occasional days off to see her doctors, provision of a stool or chair, or provision of PPE).

92.    With the aforementioned restrictions Graham was able to perform the duties and responsibilities of the following stations:[1]

a.    <u>Front Desk</u> - AHS regularly assigned employees with accommodation needs to the front desk, as a "light duty" assignment.  The employee assigned to the front desk position is responsible for receptionist duties including answering phones, checking in visitors, and other clerical work, all of which Graham was able to perform under the restrictions listed in her doctor's notes.  AHS previously assigned Graham to this position in the summer of 2023 for approximately two months, when she had injured her back.  During her prior assignment to light duty, Graham satisfactorily performed her duties and responsibilities without any impediment to AHS's operations.  On a regular basis following Graham's request for accommodations, Defendants sought additional employees to provide staffing for this position.

b.    <u>Resi Testing</u> - On the department's work schedule, one employee is assigned to this role per shift.  This role entails testing instruments to see if they are clean.

---

[1] All of the following stations are within the Sterile Processing Department, except the 'Front Desk' station, which is within the Facility.

13

c.      <u>CSR</u> - On the department's work schedule, one employee is assigned to this role per shift. This role entails wrapping trays for distribution to various clinical departments.

d.      <u>General/Peds/ENT/Eyes</u> - On the department's work schedule, one employee is assigned to this role per shift. This role entails assembling lightweight trays and peel packing.

e.      <u>Vasc/Systo/Robot</u> - This role entails assembling trays, placing trays inside containers, and ensuring equipment was cleaned properly.

f.      <u>Open Heart</u> - This role entails assembling lightweight trays and peel packing

g.      <u>Window</u> - On the department's work schedule, one employee is assigned to this role per shift. This role entails checking in loaner instruments from other hospitals and providing sterile supplies to clinical departments. Graham was regularly assigned to this position approximately two shifts per week.

h.      <u>Decontamination (Hand Wash Station)</u> - The decontamination station consists of three stations: breaking down the cart, handwashing the equipment, and machine sterilization. AHS assigned three employees to this role, one employee performing each station for the duration of the shift. The three employees assigned to decontamination generally worked out among them which employee would perform each station. The hand wash station role entails hand washing the equipment and does not involve chemicals (other than soap) or require intensive labor. Graham was regularly assigned to the decontamination position approximately one shift per week.

14

i.      <u>Low Temp Sterilization</u> - This role entails the sterilization of equipment at low temperature. Graham was able to perform this role with the provision of PPE (such as gloves and a mask), which AHS—an operator of medical and surgical facilities—possessed in abundance and ordered in large quantities.

93.    Of the remaining stations on the department's work schedule—those Graham was unable to perform due to her restrictions—prior to her pregnancy, Defendants never assigned Graham to work Loaners (which Defendants usually assigned to men due to the heavy lifting required) or Orthopedic/Trauma, and Defendants assigned Graham to the Steam Sterilization position only approximately once every three months.

94.    Prior to Defendants' refusal to accommodate Graham's pregnancy and pregnancy complications, AHS accommodated another pregnant employee in the Sterile Processing Department—a newer hire named Evelyn [last name currently unknown] ("Evelyn").

95.    Campbell—Evelyn's and Graham's direct supervisor—accommodated Evelyn's pregnancy needs by allowing her to sit in "prep and pack" and provided her with small trays, ensuring she could continue working during her pregnancy.

96.    Had Defendants provided Graham the same accommodation that Campbell provided Evelyn, Graham would have been able to satisfactorily perform the duties and responsibilities in the "prep and pack" stations in light of her restrictions.

97.    Graham continued to seek a return to work following her September 14 Note.

98.    However, Defendants continued to discriminatorily refuse to allow Graham to return to work despite the aforementioned ability to accommodate her.

99.    On or around October 23, 2023, Graham reached out to Smith to request a status update on her ability to return to work.

15

100.    Smith—other than telling Graham she needed to speak with her department (meaning Powell)—took no further action.

101.    On or around October 31, 2023, AHS formally rejected Graham's "accommodation request".

102.    AHS formally rejected Graham's accommodation request despite failing to engage in the interactive process to discuss what accommodations could have allowed Graham to perform her job.

103.    Smith told Graham that her "leave status" would be converted to a maternity leave, effective December 21, 2023.

104.    Graham had not requested a leave and had intended to return to work, with the minimal accommodations needed.

105.    Graham was confused and requested Smith call her to discuss the meaning and consequences of the leave status imposed on her.

106.    Smith eventually called Graham and told her that she could not return to work because Defendants did not have any "light duty" positions available.

107.    Aside from Graham's ability to perform numerous positions within the Sterile Processing Department, Smith's claim that Defendants did not have any "light duty" positions available was belied by Defendants' constants search for staffing for front desk/receptionist positions throughout the Facility.

108.    Graham was not granted leave as an accommodation—AHS imposed a leave of absence on Graham against her explicit request for accommodations that would allow her to continue working.

109.   Defendants did not engage in the interactive process.  Instead, Defendants insisted that they were unable to accommodate Graham so that she could continue working, without even attempting to ascertain the (minimal and easily implemented) accommodations Graham needed to perform her job duties.

110.   Though Graham was eager and able to return to work as of September 7, 2023, Defendants discriminatorily prohibited Graham from returning to work.

111.   As a result of Defendants' refusal to accommodate Graham's disability and pregnancy-related condition and discriminatory refusal to allow her to return to work, Graham suffered a substantial reduction in wages, which were further reduced upon the imposition of maternity leave on  Graham.

112.   Specifically, prior to Defendants placing Graham on her initial leave status, Graham was earning gross wages approximating $3,000.00 per bi-weekly pay period.

113.   During the initial leave status which Defendants assigned to Graham following her request for accommodation—upon information and belief, short-term disability leave—Graham received the reduced amount of $1,163.92 in gross wages per bi-weekly pay period.

114.   Upon Defendants' imposition of maternity leave on Graham and continuing through Graham's return to work on February 26, 2024, Graham received the further reduced amount of $806.38 in gross wages per bi-weekly pay period.

115.   Had Defendants provided Graham accommodations that would have allowed her to continue to perform her position, Graham would have worked until immediately before she gave birth.

116.   Additionally, by discriminatorily forcing Graham to prematurely take leave, Graham was forced to exhaust her leave time.

17

117. As a result, Defendants denied Graham the ability to avail herself of that leave after the birth of her child, to allow her more time to bond with her child.

118. On or around February 13, 2024, Graham emailed Powell to inform Powell that Graham was able to return to work on February 26, 2024.

119. Powell replied by telling Graham that all "per diem" employees were now "part-time" and would be scheduled for only three days per week and one weekend (both days) every two weeks.

120. Powell requested Graham's availability within the new part-time schedule imposed on her.

121. Based upon the restricted schedule, Graham indicated her availability for Monday, Wednesday, and Friday (along with every other weekend).

122. After speaking with her colleagues, Graham learned that Defendants did not force any other "per diem" employee to become "part-time" or work a limited schedule.

123. Of the five "per-diem" employees working in the Sterile Processing Department upon Graham's return to work—Graham, Alana, Madeline, Steven, and Matthew—only Graham was forced to become "part-time".

124. Alana and Madeline remained full-time and were not limited in their schedules, and Steven and Matthew elected to become "part-time".

125. On or around February 26, 2024—a Monday—Graham returned to work.

126. On her next workday—February 28, 2024—Graham looked at the schedule and saw that she had not been given the Monday/Wednesday/Friday schedule she selected but instead, Powell scheduled Graham to work Monday/Wednesday/Thursday.

18

127.  As she had not contemplated working on Thursday because of the schedule she submitted to Powell, Graham did not have childcare.

128.  Graham immediately explained to Campbell that she had selected Friday—not Thursday—and could not work the next day (Thursday, February 29, 2024) because she was unable to arrange childcare.

129.  When Graham saw the subsequent schedule, she noticed that Defendants had scheduled her for only two weekdays—Monday and Wednesday.

130.  On or around March 15, 2024, Graham notified Powell that she needed to call out for the following Sunday/Monday.

131.  Powell responded by removing Graham from the schedule—effectively terminating her employment—and telling Graham that she could notify Powell when she was ready to return to the reduced two-weekday work schedule.

132.  After March 15, 2024, Graham followed up with Defendants on multiple occasions requesting reinstatement.

133.  However, Graham received no response and, as a result, filed her EEOC Charge of Discrimination on or around April 1, 2024.

134.  Other employees in the Sterile Processing Department—for example, Sashell [last name currently unknown] ("Sashell")—regularly called out for scheduled shifts due to childcare issues and were permitted to rework their schedule.

135.  Sashell reworked her schedule and, as of June 2024, was still working for Defendants.

136.  Sashell and Madeline—two employees within the Sterile Processing Department—both called out more frequently than Graham.

19

137. Frequent call-outs are routine—part of the flexibility inherent in the "per diem" employee role.

138. Not only were other similarly situated employees who called out more frequently than Graham permitted to continue working, their hours were never reduced.

139. Additionally, although several of Graham's call-outs were primarily related to childcare and the result of a discriminatory and retaliatory schedule imposed on her, Madeline's call-outs are due to conflicts she has with her other, concurrent employment (of which Defendants were aware).

140. By removing Graham from the schedule and failing to pay her, Defendants effectively terminated Graham's employment.

141. Powell conditioning Graham's return to employment on needing to meet the same discriminatory and retaliatory conditions to which she was subjected prior to her effective termination neither remediates the termination nor serves as a genuine offer of reinstatement.

142. Graham was forced to endure Defendants' discriminatory and retaliatory conduct while dealing with a medical issue complicating her pregnancy and then again after she had given birth, caring for a newborn.

143. As of September 7, 2023, with a reasonable accommodation allowing her to take bathroom breaks and to sit on occasion, Graham was able to satisfactorily perform the duties and responsibilities of any one of (at least) nine stations within the Facility, including (at least) eight stations within the Sterile Processing Department.

144. As of September 14, 2023, and continuing through the remainder of her pregnancy—a four-month period—Graham was able to satisfactorily perform the duties and

responsibilities of any one of (at least) nine stations within the Facility, and (at least) eight stations within Sterile Processing Department, with only minor additional accommodations.

145. Despite her ability to perform the essential functions of the Sterile Processing Technician role, Defendants failed to provide Graham with a reasonable accommodation for her pregnancy and pregnancy-related medical condition, preventing Graham from returning to work.

146. The accommodations required by Graham to allow her to perform her job responsibilities—to take regular breaks, to take standing breaks (or not stand), to avoid lifting heavy objects or repetitive strenuous motions, to limit exposure to hazardous chemicals, and to see her doctors when necessary—were reasonable and did not impose an undue burden on Defendants.

147. Despite Defendants' awareness of Graham's pregnancy and pregnancy-related disability and ability to accommodate Graham, Defendants refused to provide Graham with a reasonable accommodation.

148. Defendants refused to engage in an interactive dialogue to determine what accommodations—even if different from the accommodations requested by Graham—could have been provided to allow her to perform her duties and responsibilities.

149. Instead, Defendants discriminated against Graham on the basis of her sex/gender (on account of her pregnancy) and pregnancy-related disability—her low-lying placenta—by refusing to accommodate her, placing her on an involuntary—upon information and belief, short-term disability—leave, and then placing her on a maternity leave.

150. Graham repeatedly opposed Defendants' discriminatory refusal to allow her to return to work and forcible placement on leave.

151. Defendants further discriminated against Graham and retaliated against her after and because of her opposition to Defendants' discriminatory conduct by continuing to deny

21

Graham reasonable accommodations to allow her to return to work, forcing Graham to accept "part time" status, by modifying her work schedule, by further reducing her work schedule, and—ultimately—by removing her from the schedule altogether, effectively terminating her employment.

152. Powell, by refusing to accommodate Graham, refusing to allow Graham to return to work because she needed accommodations, and by failing to engage in the interactive process, aided and abetted in the discriminatory conduct to which Graham was subjected.

153. Powell, by continuing to refuse to accommodate Graham or engage in the interactive process, by continuing to prevent Graham from returning to work and forcing her to earn a substantially reduced income, by forcing Graham to accept "part time" status, by modifying her work schedule, by further reducing her work schedule, and—ultimately—by removing her from the schedule altogether, effectively terminating her employment after and because of Graham's opposition to Defendants' discriminatory conduct, aided and abetted in the retaliatory conduct to which Graham was subjected.

154. At all times relevant to this action, Powell know or should have known her conduct was unlawful.

155. At all times relevant to this action, Defendants' discriminatory and retaliatory conduct towards Graham was active and purposeful.

156. Defendants' actions and conduct were and are intentional and intended to harm Graham.

157. Defendants have caused damage and injury to Graham by first failing to accommodate Graham and subjecting her to discrimination and then again by retaliating against her after and because she opposed Defendants' unlawful discriminatory conduct.

158. As a result of Defendants' unlawful discriminatory and retaliatory conduct, Graham was humiliated, demeaned, and belittled, and Graham suffers and continues to suffer a loss of rights, emotional distress, loss of income, and earnings.

159. As a result of Defendants' discriminatory and retaliatory treatment, Graham suffered and continues to suffer severe emotional distress.

160. As a result of the acts and conduct complained of herein, Graham has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and Graham has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

161. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower Courts.

162. As Defendants' discriminatory conduct has been especially egregious, and Defendants' upper management actually participated in and/or was willfully indifferent to the wrongful conduct, Plaintiff also demands punitive damages in an amount which exceeds the jurisdictional limits of all lower Courts.

## FIRST CAUSE OF ACTION
### Failure to Provide a Reasonable Accommodation in Violation of the ADAAA
### (As to Defendant AHS only)

163. Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

164. The ADAAA, 42 U.S.C § 12112(b)(5)(A) requires employers to provide:

> reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

165.    AHS is a covered entity subject to the provisions of this statute.

166.    Plaintiff was a qualified Sterile Processing Technician employed by AHS.

167.    Plaintiff suffered from vaginal bleeding as a pregnancy-related complication due to her low-lying placenta.

168.    Plaintiff provided Defendants with multiple notes from her physicians setting forth her physical limitations and the accommodations necessary to continue to perform her job duties.

169.    Providing Plaintiff with the accommodations she needed to allow her to return to work would not impose an undue hardship on AHS's business operations.

170.    Defendants refused to accommodate Plaintiff's disability by among other reasons set forth herein, repeatedly denying her requests to return to work despite many available stations within her restrictions, failing to engage in the interactive process, failing to offer any other reasonable accommodation allowing Plaintiff to return to work, and forcing her to accept multiple leaves of absence, resulting in a reduction of her compensation.

171.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**SECOND CAUSE OF ACTION**
**Discrimination in Violation of the ADAAA**
**(As to Defendant AHS only)**

172.    Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

173.    The American with Disabilities Act, as amended, 42 U.S.C § 12112(a) provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to… discharge of employees… and other terms, conditions and privileges of employment.

174.  AHS is a covered entity subject to the provisions of this statute.

175.  Plaintiff was a qualified Sterile Processing Technician employed by AHS.

176.  Defendants discriminated against Plaintiff on the basis of her disability by refusing to accommodate her, placing her on an involuntary—upon information and belief, short-term disability—leave, and then placing her on a maternity leave.

177.  Defendants further discriminated against Plaintiff on the basis of her disability by continuing to deny Plaintiff reasonable accommodations to allow her to return to work, forcing her to accept "part time" status, by modifying her work schedule, by further reducing her work schedule, and—ultimately—by removing her from the schedule altogether, effectively terminating her employment.

178.  As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**THIRD CAUSE OF ACTION**
**Retaliation in Violation of the ADAAA**
**(As to Defendant AHS only)**

179.  Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

180.  By the actions described above, among others, Defendants have retaliated against Plaintiff by continuing to deny Graham reasonable accommodations to allow her to return to work, forcing Graham to accept "part time" status, by modifying her work schedule, by further reducing her work schedule, and—ultimately—by removing her from the schedule altogether, effectively terminating her employment, after and because she engaged in protected activity.

25

181.  As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**FOURTH CAUSE OF ACTION**
**Discrimination in Violation of Title VII**
**(As to Defendant AHS only)**

182.  Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

183.  By the actions described above, among others, Defendants have discriminated against Plaintiff because of her gender/sex (on account of her pregnancy), in violation of Title VII, as amended by the Pregnancy Discrimination Act.

184.  As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**Retaliation in Violation of Title VII**
**(As to Defendant AHS only)**

185.  Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

186.  By the actions described above, among others, Defendants have retaliated against Plaintiff in violation of Title VII, as amended by the Pregnancy Discrimination Act, after and because she engaged in protected activity.

187.  As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**SIXTH CAUSE OF ACTION**
**Failure to Accommodate in Violation of the PWFA**
**(As to Defendant AHS only)**

188.    Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

189.    By the actions described above, among others, Defendants have failed to accommodate Plaintiff's pregnancy and pregnancy-related medical condition, in violation of the PWFA.

190.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**SEVENTH CAUSE OF ACTION**
**Failure to Accommodate in Violation of the NJLAD**
**(As to all Defendants)**

191.    Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

192.    By the actions described above, among others, Defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12(s), by failing to accommodate Plaintiff's pregnancy and pregnancy-related medical condition caused by a disability—her low-lying placenta.

193.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**EIGHTH CAUSE OF ACTION**
**Discrimination in Violation of the NJLAD**
**(As to all Defendants)**

27

194.    Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

195.    By the actions described above, among others, Defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by discriminating against Plaintiff because of her pregnancy and disability.

196.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## NINTH CAUSE OF ACTION
### Retaliation in Violation of the NJLAD
### (As to all Defendants)

197.    Plaintiff hereby repeats and realleges the preceding paragraphs as though they were fully set forth herein.

198.    By the actions described above, among others, Defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by retaliating against Plaintiff for her opposition to Defendants' unlawful discriminatory conduct.

199.    Defendants engaged in unlawful employment practices prohibited by the New Jersey Law Against Discrimination by retaliating against Plaintiff as a result of Plaintiff's opposition to Defendants' unlawful employment practices.

200.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

28

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the practices complained of herein are unlawful under applicable federal and state law;

B. A declaratory judgment that Defendants violated the ADAAA, Title VII, PWFA, and NJLAD by failing to accommodate Plaintiff, discriminating against Plaintiff, and retaliating against Plaintiff after and because she complained of and/or opposed Defendants' discriminatory conduct, and awarding a recovery for damages sustained

C. An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D. An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, the loss of benefits, promotions, raises and opportunities, and other benefits of employment;

E. An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or economic damages, including but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional and psychological pain and suffering, emotional and psychological distress and the physical manifestations caused;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre-judgment interest;

G. An award of pre- and post-judgment interest

H. An award of punitive damages;

I. An award of reasonable attorney's fees, costs, and expenses of the action, pursuant to applicable law; and,

J. An award of such other relief that the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: April 16, 2025
    Newark, New Jersey

**AKIN & SALAMAN P.C.**

*/s/ Justin Ames*

_____

Justin Ames, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (201) 366-3650
Email: justin@akinlaws.com
*Attorneys for Plaintiff*

30